Page number 21-59-2 State of Illinois and State of Nevada Appellant v. David Ferriero in his official capacity as Archivist of the United States et al. Ms. Notes for the appellant, Ms. Harrington for the appellee, David Ferriero. Good morning, Ms. Notes. Good morning, Your Honor. May it please the Court, my name is Jane Notes on behalf of the plaintiff's appellants. The District Court granted the Archivist's motion to dismiss on two grounds. The Court held, first, that the plaintiff's case lacks standing, and second, that the deadline Congress included in the proposing clause is enforceable against the state. We request reversal on both grounds and also a remand to the District Court to address the remaining issues in the case in the first instance. I'll start with the standing issue. The plaintiff states exercised their sovereign prerogative and constitutionally delegated authority to ratify the amendment Congress proposed, but the Archivist has refused to count their ratifications and publish and certify the amendment. The plaintiff states then brought suit to ensure that their ratifications are given their intended effect, and just like in Coleman, their claim that a government official is improperly overriding their ratification votes and holding them for not presents a legally cognizable injury. Contrary to the District Court's holding, the fact that the amendment became constitutionally valid and ratification by the 38th state does not change the result of the standing analysis. As this Court's decisions in Barnes and Kennedy make clear, a law's publication has meaningful practical consequences, even though the publication may not affect the law's validity. I don't understand why you said what you just said there, it doesn't affect the law's validity. You don't cite it, but right after Section 106B in Title I is Section 112, which relates to the statutes at large, and it says that the Archivist shall publish the statutes at large and include in that not just bills that are enacted, but also any constitutional amendments that become effective, and what Section 112 says is that the statutes at large shall be legal evidence of law. So it has a legal effect. If something is in the statutes at large, it's binding on the Court that that is the law. So I don't understand why you didn't cite that and why you're not making that specific argument. Well, yes, Your Honor, we certainly agree with your analysis and your view about Section 112. That is one of the practical consequences that will result from publication and certification. As Your Honor noted, when the amendment is published and certified, it will be added to the official version of the Constitution as well as the statutes at large, which means that it will be admissible in court as evidence. And what that means is that people will be more likely to take advantage of the rights that our state has sought to secure for them, and in addition that other states and the federal government that may not have brought their laws into compliance with the amendment will be encouraged to do so. Ms. Smith, can you say a little bit more about what the precise injury is here? Because it seems that all parties agree that if 38 states properly ratify the amendment, then it is part of the Constitution, irrespective of what the archivist does. And so that is just an operation of the Constitution and the constitutional amendment process. So if that is the case, it seems to me that the injury the states have, if they have an injury, probably arises under Section 106B, or let's assume that that is the case. What is the injury to the states from a failure to effectuate 106B? If the amendment has legal effect, whether or not the archivist takes the action. Yes, Your Honor, and we do agree that the amendment is constitutionally valid because it was ratified by the 38 states. But publication and certification will have important practical consequences, as I was discussing in response to Judge Wilkins' question. Well, what's the legal consequence? Because the harm that you're claiming is a legal harm. So what is the legal consequence? Of course, there are practical consequences of recognition. Is there a legal consequence of the archivist's recognition? Well, certainly, as Judge Wilkins indicated, one consequence is that the amendment will become admissible in court once it is added to the statute at large. But insofar as the states are concerned, the injury to us is that our ratifications are not being given their intended effect. But you already said that you think the amendment is effective. So what is the effect? What precisely is the effect that's the injury? Because your position is that the amendment, the ERA, is already in effect because it has the requisite ratification. So if that's your position about the ERA, then what is the harm from the lack of publication? The harm from the lack of publication is the fact that our states ratified the amendment in anticipation that it would be recognized as legitimate. And due to the archivist's inaction, our purpose in ratifying the amendment is not being served. As I noted, the purpose of ratification was to get publication of the ERA? The purpose of ratification was so that people would take advantage of the new right that we had sought to secure for them. And in addition, that the federal government and the states who may not have brought their laws into compliance with the amendment would do so. And I would point, Your Honor, again to this Court's decisions in Barnes and Kennedy, wherein the Court recognized that publication of a new law has practical consequences sufficient to confer standing, even if publication doesn't impact the law's validity. Do you think a private citizen could sue to enforce Section 106B or only the states? No, I think certainly if a private citizen had been injured by non-recognition of the citizen's rights under the amendment, they could sue. But their injury is different than ours. Our injury is the non-recognition of our ratifications, which is exactly the same injury that the Supreme Court recognized in Coleman when it found that the plaintiffs there had standing to vindicate their ratification votes. Speaking of Coleman, Coleman described Dillon as holding that Congress has the authority to set a ratification deadline. Why isn't that the end of the case? Thank you, Your Honor. I appreciate you moving me off of standing onto the deadline issue. So the reason why that's not the end of the case is to be sure. I recognize that Coleman, to paraphrase Dillon's language, It said we held. Yes, Your Honor. But right around the same time as the Supreme Court decided Coleman, it also decided Sprague. It decided Sprague before Coleman, so Coleman was the later word. It is, but I think what it shows is that the Supreme Court sort of contemporaneously recognized that the language in Dillon was victim. It actually was victim. It was not necessary to the resolution of the question presented. Supreme Court said we held. That's not saying that the language in Dillon was victim. It talks about the specific issue of Congress's ability or power or authority to set a deadline. My position is that that was inartful on the Court's part, but even if Coleman did sort of make Dillon's victim somehow a holding, even though it wasn't necessary to the resolution of any question presented there, Dillon and Coleman are distinguishable from this case because in Dillon and Coleman, they did not concern a deadline that was set in a proposing clause. There are meaningful differences between deadlines set in proposing clauses and deadlines that are set in the text of the amendment. I'm into my rebuttal, but I would like to make just a few quick points explaining why that is so. At the outset, limiting Congress's ability to set deadlines to deadlines in text better respects the plain language of Article 5 and the co-equal role that it assigned to Congress and the states. It leaves Congress free to propose amendments without interfering with the state's ability to ratify amendments. Second, a contrary rule would leave Congress free to impose all manner of limits on state ratification process needs and thereby undermine the ability of states to control their own ratification. For example, Congress could use a proposing clause to decide that ratifications by state legislatures require a super majority where some or maybe even all of the states themselves had decided only a simple majority was required. And then finally, to the extent that past congressional practice is relevant, deadlines in proposing clauses are a new and short-lived innovation. Congress began putting deadlines in proposing clauses in only 1960. It did so for only 12 years over only five proposals. The practice was controversial among certain members of Congress at the time. And since then, Congress has returned to putting the deadline in text. So for all these reasons, our position is that the deadline that Congress included in the proposing clause is unenforceable against the states and the district courts holding to the contrary should be reversed. But you're not arguing that it's unconstitutional for Congress to place a deadline in a resolution of a proposed constitutional amendment, right? If I could just clarify, in the text of the proposal as opposed to the proposing clause or in the proposing clause? Well, either. Yes, Your Honor. You're saying that you argue that it's unconstitutional for it to be in the... In the proposing clause, yes. In the proposing clause. Yes, and therefore unenforceable against the states. And the reason that it's unconstitutional if it's there but not in the text is what? Because the plain language of Article V and the drafting history show that the framers intended that the states and Congress would be co-equal participants. There would be no sort of third step whereby Congress could overrule or veto state ratifications. The framers intended that Congress be free to propose amendments but without interfering with the state's ability to ratify amendments. But hasn't the Congress in every constitutional amendment that's been proposed put in the proposing clause the mode, i.e., by ratification of the legislature or following a state constitutional convention? That's been in the proposing clause of every single amendment. How is that constitutional but not in the deadline? Your Honor is correct. And putting the mode in the proposing clause is quite different from putting a deadline in the proposing clause. And that is so for three reasons. And the first is because Your Honor's question assumes that Dillon's victim is persuasive. Dillon said that Congress can set a deadline incident to its power to designate the mode of ratification. But that language simply isn't persuasive or particularly consistent with modern methods of constitutional interpretation because it employs an unorthodox and overly expansive meaning or definition of mode. The ordinary dictionary definition of mode is the form or the way of doing something. And controlling when something occurs is completely different from controlling how it occurs. And then the second point I would make is to the extent that it challenges... Do you have any, I mean, I'm not sure, I mean, what is your support for the idea that a time frame is not part of the mode of something? You know, that you may ratify something but within a time period. Why isn't that part of the mode? Because, again, I look at the ordinary dictionary definition, which is how we interpret the Constitution at present. And what that definition shows is that the mode is the form or the way of doing something. And I don't understand controlling when something occurs to be part and parcel of controlling how it occurs. I mean, it would seem that the text of Article V supports your argument as well because it says it has one or the other mode of ratification. So the text itself seems to be saying when we talk about mode, we're talking about one thing or another thing, but not a third or fourth or fifth thing. The problem that I have, though, is that even if I think that your argument has some force, in order for us to grant mandamus, it has to be clear and indisputable. And even if we think that the formant's language was a little loose, the court said we held. And how are we to find that this issue was clear and indisputable, given that and given how the Supreme Court dismissed the Idaho case on mootness grounds at the suggestion of the Solicitor General? How do we get to clear and indisputable, given those things? Yes, Your Honor. We do recognize that deciding whether the deadline is enforceable may require interpretation of Article V. But this Court has never held that mandamus can't lie simply because of the presence of an interpretive question, even a question of first impression, under circumstances where the controlling statute creates a mandatory duty. And Section 106B creates a mandatory duty. It uses mandatory terms, shall and whenever. And this Court held in Holby that it creates a purely ministerial duty. Now, I know that the archivist argues otherwise, but she is relying on cases wherein the statute at issue was ambiguous with respect to the government official's duty. And in those cases, this Court explained, the statute necessarily conferred a measure of discretion on the government's official. But that is not the case here. Here, again, 106B creates a mandatory duty by its plain language and by this Court's interpretation of it in Holby. I agree that it is a kind of ministerial duty. If, you know, the amendment has been adopted, if the official notices are in, then the archivist must publish. However, the fact that it's ministerial, I think, doesn't mean that there's no role for the archivist. I mean, there are multiple official notices that come to the archivist from 38 states, also from Congress, when it proposes the amendment. So there are 39 official notices, in effect, that go to the archivist. So the archivist has, it seems to me, at least at a minimum, to count the notices, right? To note that, you know, the notices have come. And I'm wondering, as part of that, why can't the archivist make sure that the 38 notices that come from the states match what has been proposed by Congress, which includes, for instance, the date of ratification? So Congress proposes this amendment, and these notices come in. If the notices don't come in in the timeframe, you know, why can't the archivist say, these things are not compliant? There's no official notice, in effect. I certainly agree that the archivist can confirm that the states have ratified the amendment that Congress actually proposed. The difference here, though, is that the deadline is in the proposing clause. It wasn't in the text of the amendment. And so that goes back to our position that the deadline is unconstitutional, because it appears in the proposing clause. So if the dates were in the amendment text, then you think the archivist could ensure that the official notices came within that timeframe? I think that that would be a much closer question. Why would that be a close question? That would be a close question, because I do think that there is a legitimate question whether it's constitutional to place a deadline in text. But the court doesn't need to decide that in this case, because this concerns a deadline in the proposing clause. And so the archivist, which I do think is part of his role, or her role, I'm sorry, to confirm that the proposal matches the proposed amendment matches what the states ratify, if it were constitutional to include a deadline in text, yes, that would be part of that role. So if we were to agree with your position about this, that the date being in the proposing language is not effective as to the timing of the state ratification, then it seems we would have to reach the question of whether a state can rescind its notice, wouldn't we? So our position with that is, is that something most appropriate for the district court to resolve in the first instance with the input from the archivist? Because she has not yet provided her... That's a purely legal question. Certainly, yes. I mean, if the court wants to, it can reach the rescission issue. And our position there would be that states cannot rescind their ratification. So we have to reach that issue, though, to determine whether there's a clear duty for the archivist? Our position is that you do not, but certainly the court would. We're not arguing that the court necessarily has to direct the archivist to publish and certify without reaching both the deadline and the rescission issues. Our position with respect to rescission is that simply that's something that the district court should decide in the first instance on remand with the input from the archivist. If the court were inclined to reach the issue, our position is that rescission is not contemplated by the plain language of Article V. It refers to ratification, not rescission. Rescission is the opposite of ratification. It also would be inconsistent with the drafting history, which shows that the framers intended ratifications to be irrevocable, that there wouldn't be conditional ratifications. And then finally, it would call into question the 14th and the 15th Amendments. I have a little concern about going into those decisions. You all were very specific about the issues that you presented before the court, one being standing, one being whether essentially the archivist has a ministerial duty to publish and certify, notwithstanding the time period. So it sounded to me in your briefing that you only wanted us to reach whether or not there was that ministerial duty and that you are suggesting that there's almost a step two, that go with duty and certification and then anything that applies to these time frame periods is kind of another question that you don't believe the archivist is supposed to resolve. That you believe that it's supposed to be just we received it, it went through constitutional convention, it was three quarters ratifying, and then that's it. And so we're also having discussion now about these time periods, but I'm not sure that it just sounds like you crafted your question very narrowly. Thank you, Your Honor. With respect to deadline, and I hope this answers your question, we presented two alternative arguments. The first argument was that the archivist has no ability to decide as an unelected member of the executive branch, with no role in the ratification process, that our ratifications basically didn't count because they weren't reached after the deadline. The court certainly could decide our disappeal on that argument, but we also believe that the question of whether the deadline is enforceable is squarely before this court. And so if the court wanted to avoid dealing with that question in the future, it could decide on that basis. What we think the court can't do, though, is we think that the court can't decline to decide whether the deadline is enforceable, also find that we have standing, but nevertheless, affirm the decision below. Because we do think that the archivist has a ministerial duty, and there's nothing in that duty that allows her to resolve these legal questions. Let me ask you a question. Let's suppose Virginia's resolution approving the amendment changed the language and said that equality of rights under the law cannot be denied or abridged by the United States or any state when a Trump upsets. And then they added, except, and they put some brown there, except for sincerely held religious belief or except under extraordinarily compelling circumstances. So let's suppose that was the language that the Virginia legislature approved by the requisite number according to their state constitution laws. And the archivist received that, and we didn't have any timeliness issue. They received that official notice from Virginia. What's the archivist's duty? The archivist's duty is to substantiate the same amendment as the amendment Congress proposed. It sounds like what you're describing would be a substantive change in the amendment. And so the archivist would be able to decline to recognize the ratification on that basis. If it were just sort of technical irregularities, in those circumstances, the archivist could make the decision to accept the ratification. And there's case law to that effect. I think the archivist cites it in her brief. So it's ministerial, but it's only ministerial once the judgment has been made that all of the official notice is, you know, there's no, in my hypothetical, there's no dispute that the notice that they received was official, that it was an official notice from a state. The archivist there had to still nonetheless make a judgment as to whether or not this official notice comported with the proposed amendment that Congress approved, right? So how is that different than assessing whether Congress's intent that there be a deadline has been complied with? So I see that as different because Section 106B basically gives, in our view, the archivist three tasks. And you described them, to confirm that the notices are official notices, to confirm that the proposal that was ratified is actually what Congress proposed, and to confirm that the mode among the two available that Congress designated was used. You know, basically to confirm that the requirements expressed on the basis of Article V are satisfied. I do agree, though, that this is just our first argument. Our second argument is that the district court erred in concluding that the deadline is enforceable. That question is squarely before this court. It is fully briefed by all the parties. In the district court, the archivist took the position that's a political question. That's not the case anymore. We certainly agree that this court can skip over our first argument as to deadline and then decide the merits question. And if the court were to do so, what that would mean is that the court's ruling would make clear, assuming the court agrees with us, that the archivist has no discretion to discard our state ratifications merely because they were reached after the deadline expired. So your argument, Tom? Well, in Idaho v. Freeman, and it had a different name when it got to the Supreme Court, the defendant there was the administrator of the GSA, who is in the same position statutorily as the archivist is now. And the solicitor general in the suggestion of movement said that the administrator does not intend to recognize, essentially said that the administrator does not intend to ever publish and certify the Equal Rights Amendment because the deadline has passed. And because the time has lapsed, this case is moved. So they said those two things. One, what the administrator doesn't intend to do because the administrator has made a judgment about the deadline. And then the second thing, the declarative statement that this deadline has lapsed, so this issue is moved forever. You don't need to adjudicate the validity of Idaho's ratification because it can never be in dispute about whether the Equal Rights Amendment is going to be ratified because it can't at this point. And those were the grounds that the Supreme Court cited in its order dismissing the case as moved. It had heard briefing on likeness and other grounds, but it didn't choose those grounds. It chose those movements. How are we to get around that? Thank you for the question, Your Honor, because I know you referenced the Freeman case earlier, so I appreciate the opportunity to address it. So I don't think there's any dispute that the Supreme Court's summary dismissal in Freeman is not precedential. Really, the debate is about what persuades it to be. What do you mean it's not precedential? Because there's a case law holding that a summary dismissal does not have precedential value. Summary dismissal of a cert petition, but that precedent doesn't apply to an order dismissing a case moved. Your Honor, I think it does, and I don't have the case name at my fingertips, but I can certainly have it in time for rebuttal. There is a Supreme Court decision indicating that the summary dismissal on witness grounds is not precedential, and I will have that for you on rebuttal. But if you'll, I guess, take my word for that for the moment. The question is, how much persuasive value does this summary dismissal have? And our view is that it has little to none, and that is so for two reasons. The first reason is that the question presented here, relating to the enforceability of the original deadline, was not before the Supreme Court in the Freeman case. That case was about the enforceability of extension, which occurred under different circumstances. And then the second reason is because the summary dismissal was entirely unreasoned. We don't know why the Supreme Court thought it was moved. And I don't think that we can rely on speculation about why the Supreme Court thought the case was moved to assume that the Court has adopted an interpretation of Article V that would be inconsistent with the language and the history of Article V, and would also essentially open the door to Congress to put into the proposing clause of a proposed amendment all manner of limits on state ratifications. One of the arguments that Idaho made in the district court, and I can't remember if the district court explicitly agreed with it, because I think that the district court held that the decision was valid. But one of the arguments that was made was that when we, Idaho, approved the ERA, we approved it with the seven-year deadline engrafted into our approval, so our approval lapsed after the seven years was up. And so even if our rescission isn't valid, then our approval has now lapsed and can't be used and can't be counted, and we're asking for a court order directing the administrator to never count bars because the time period has lapsed. So that issue was also before the Supreme Court, was it not? You know, I have not been able to find, either in the record in this case or sort of in the public domain, a copy of the National Organization of Women's Cert Petition. So I don't – it's possible that that issue was among the questions presented. I don't actually know for sure, and I think what Your Honor's question is getting at is discerning the Supreme Court's reasons for dismissing the case as new in Freeman requires speculation. Given that the dismissal wasn't entirely unreasoned, again, our position would be that this court should not assume that the Supreme Court would have departed from the language and history of Article V and essentially elevated, you know, Congress's role in the ratification process to give Congress the ability to include not only deadlines and proposing clauses, but again, all manner of limits on state ratification. But how is saying that the deadline is constitutional and enforceable endorsing all manner of limits or any other? Well, I don't know, for example, if the state Congress were to decide that state ratification should be by a supermajority, even though the states themselves have decided on an individual state basis that it should be by a simple majority. I don't know how you would draw a distinction between that circumstance and Congress's inclusion of a deadline. I mean, arguably setting the first state circumstance requiring a supermajority for ratification is arguably more within Congress's ability to designate the mode, because as Your Honor pointed out, Congress expressly on Article V has the ability to select state ratifications as one of the two modes available to it. Let's suppose you're right about this argument then. And doesn't it mean then that the resolution that includes a deadline is unconstitutional and therefore it doesn't appear there's no severability clause? And the legislative history seems to indicate that Congress only passed it because it did have this deadline, given the failures to pass by the supermajorities required previously. So wouldn't then the result be that we invalidate the proposed amendment as opposed to just striking the deadline? No, Your Honor. So insofar as the reliance by certain members of Congress on the deadline, with respect to the original proposal, even if a significant number of members of Congress that did influence their decision, and I don't think we know that from the record. What we know from the legislative record is that a small number of influentials. We know that that's what they passed. So it doesn't matter what they intended. That's what they passed. Yes. So thank you very much, Your Honor. You've actually moved me on to my second point, which is perhaps the better one, is that Congress not all the time, but every now and then, passes laws that Congress thinks are constitutional, and courts don't hesitate to strike them down when they're unconstitutional. The deadline included in the proposal clause is no different. If Congress did not have the constitutional authority to include the deadline in the proposal clause, then it would need to be invalidated. So that seems to open. I mean, you're worried about a slippery slope about what Congress might include in a preparatory clause, but your reasoning suggests that this court can determine what Congress may propose in an amendment to the Constitution. What would be the limit on that? You say dates are out, but you suggest dates may not even be permissible in the actual amendment text. So what other limits, what other judicial limits are there on what Congress can propose as an amendment to the Constitution? That seems to open up, you know, that seems to take us way down the slippery slope in terms of undermining Congress's ability to propose amendments to the Constitution, which is, of course, one of the primary checks on the court innovating in the area of constitutional law. So, Yoneth, I'm understanding your question. You're asking, are there any limits on what Congress can propose in the text of an amendment as opposed to the proposing clause? Am I understanding that correctly? Well, you're suggesting there are limits to what Congress can put into the amendment text as well as the proposed clause, and that those limits can be ascertained by courts. So for purposes of this case, we are not conceding that Congress can include a deadline in a text, because in this case, the deadline is in the proposing clause. I don't think for purposes of this case, the court needs to decide what Congress can and can't put into the text of a proposed amendment. Our point is simply what Article V anticipates is that but for designating the mode of ratification among the two available choices on the face of Article V, any limits that Congress wants to put on state ratification cannot go in the proposing clause. Perhaps they can go in the text. The whole argument really turns on that point, that there is a distinction between the text of the amendment and the preparatory language. Without that distinction... I disagree slightly. I think our point is that the court doesn't need to decide the harder question, but we're not conceding that a deadline could go in the text, but the court simply doesn't need to decide it, because there are meaningful differences between the proposing clause and text, because... And we have to agree with that position, that there is a difference, in order to agree with your view. I would agree with that, because otherwise, I mean, we would be urging the court to find that Congress can't put a deadline in text, and, I mean, I'm happy to sort of talk about why the reasons why that may not be true, but I certainly agree that that is a closer question. So I've gone way over my time, so... Thank you. We'll give you some time on revising. Thank you. Thank you, Your Honor. I may excuse the court. I'm Sarah Harrington, on behalf of the Acting Archivist, Deborah Wall. I would like to start, if I could, by emphasizing what this case is not about. This case is not about the wisdom and the importance of the principles espoused in the Equal Rights Amendment. And this case is not about whether the ERA is, in fact, part of the Constitution. The Biden administration supports the principles that are espoused in the ERA, but the plaintiffs concede that nothing in this case will or could affect the legal status of the ERA. Because the plaintiffs' deaths were a lack of standing, we urge the court to affirm dismissal on that thesis. I mean, it's one thing to say that ratification is kind of self-executing, but what's not self-executing is making a constitutional amendment or even a bill that gets signed by the president after being passed by the House and the Senate. Not self-executing that that bill that now becomes a law, becomes a part of the canon, so to speak, and in being expressed in the statutes at large. So why doesn't the obligation of the archivist to put a ratified constitutional amendment in the statutes at large, why isn't that a legal effect, especially since the statutes, Section 112 says that the statutes at large are conclusive evidence of what the law is, and the Supreme Court has so held. Well, Section 112 says that they're evidence of what the law is, but it doesn't say that including something in the statutes at large makes it law. So you could have an unconstitutional law that is included in the statutes at large that is later found to be unconstitutional and therefore not law. But if it's not in the statutes at large, then it doesn't count. It has to be both. If it's in the U.S. Code, then that's unlike prima facie evidence that this is a real law. But our Supreme Court has said, you know, the conclusive evidence that this is actually a real law is if it's published in the statutes at large. But I don't think that means that it makes it law. The plaintiffs don't dispute that the ERA either is or isn't part of the Constitution today, and that nothing the Archivist has done or could do in the future would affect that. And so I think the real point is that nothing flows from the proclamation that they seek or from the, you know, publishing in the statutes at large. And they haven't identified any concrete injury to the plaintiffs that would flow from the Archivist's failure. If someone brought a suit today, a woman brought a suit today and said, you know, action by state acts violates the Equal Rights Amendment, the defense would be the Equal Rights Amendment is not on the books. And so there's nothing kind of like to enforce. And the case would be dismissed on those grounds, right? I don't think so. I think the defense would be substantive. It would be that the Equal Rights Amendment is not part of the Constitution and therefore not something that a state act or whoever that defendant is has to comply with. You know, there is case law from this court and the Supreme Court saying that the Archivist's proclamation has no legal effect. There's no reason that publishing in the statutes at large would be any different. The ratification either happened when Virginia ratified or it didn't happen and nothing that any federal official can do will change that. I think it's important to keep in mind that Article V envisions no role at all for the executive branch in the ratification process. So what does Section 112 mean when it says the United States statutes at large shall be legal evidence of laws, etc., etc., and propose or ratify amendments to the Constitution? I think it just means that it's evidence. It doesn't say definitive evidence. It doesn't say conclusive evidence. It doesn't say it has legal effect. It means that it's evidence of what the law is. But there is other, you know, there is case law from the Supreme Court and this court saying that the ratification process is a little bit different from other legislative processes in that it is complete when the final state votes to ratify. That argument seems to ignore the whole purpose of why we have Section 106B in the first place and why we had the predecessors to it, which was that in the titles of nobility issue where people didn't know whether that amendment had been passed and ratified and some thought that it had, but because there were more states that had been added to the union that really didn't have the requisite supermajority and isn't part of the Constitution, and Congress said, you know, this is no way to run the railroad. We need to have somebody, you know, in charge of plumbing noses and then certifying and then publishing so that, you know, we'll all know what the law is. So... Claiming a record-keeping function is not a substantive determination of the validity of an amendment. You're right that the predecessor to 106B was enacted because there was confusion about when, I think the 11th Amendment was one example, when that amendment took effect because communication was obviously not as instantaneous then as it is now and so people didn't always know when states had voted to ratify. So this is intended to have sort of a central record-keeper. It gave notice to the Secretary of State and then the Administrator of General Services and now the Archivist. And the Archivist keeps the records and when it is clear that an amendment has been ratified, publishes a certification or a proclamation for that effect. But it's not a substantive determination. The Supreme Court held that in Holden, the Supreme Court held that in Dillon. It is just a ministerial act that has no substantive application. And I want to, you know, you pointed out that there are plenty of plaintiffs, presumably, who would have standing to tee up these fascinating and important questions about whether the ERA is in fact part of the Constitution. An individual who has been injured in a concrete way, a state action that the individual thinks is not in conformity with the ERA, can sue that state actor and seek as part of that to enforce the ERA, that will certainly, that state would certainly need to involve in the determination of whether the ERA is in fact enforced. Anybody? I'm interested. I mean, I think the standing question here is actually quite tricky because it seems, I mean, all the parties agree that there's only, that the legal effect of the amendment, its actual substantive effect, you know, is irrespective of whether the archivist publishes the amendment. That seems right to me. However, we have in a number of contexts the idea that like a certification or a recognition or a publication means something, something more than what is purely ministerial. So, for instance, like in a presidential election, if there is a concern about the count, then there is a challenge to the certification of that, right? So, a person becomes president if they have, you know, the requisite number of electors. You know, it doesn't really matter if it's recognized, but in order to challenge what's actually happened in the election, there is a challenge to the certification, right? And that's been recognized in a number of cases. And so, it seems to me that the archivist's duty here, while not necessarily affecting whether the amendment has substantively become an amendment, it still may have some type of legal effect. And if that's true, then maybe it can give rise to an injury by the states because it is the sort of official way that this becomes, you know, part of the way that the federal government and the states recognize that the amendment is in place. Some think that that view of the proclamation of certification can be spurred by this court decision in Colby or this Supreme Court decision in Dillon and other cases. But they say that proclamation has no legal effect. And so, maybe there are certifications in other contexts that might have legal effect, but in this context, I think there is binding case law saying this proclamation has no legal effect. And certainly, these states have not identified any legal effect on whether the amendment has been ratified. But it may have some other kind of legal effect, right? I mean, Congress has enacted Section 160B, you know, pursuant to its, say, necessary and proper power to implement Article 5, you know, in the amendment process. And because the Constitution itself provides for no mechanism of, like, counting the states' ratifications. And so, it may have no legal effect on whether the ERA is an amendment to the Constitution, but it may still have some other type of legal effect. It's the burden on the states to identify what that effect is and how it injures them. They haven't done that. They say that it interferes with their ability to participate in the ratification process. It doesn't. They have participated in the ratification process. They say in their complaints they have ratified the ERA, that it is part of the Constitution. They say that it, you know, and everyone agrees it doesn't actually have any effect on whether the ERA is, in fact, part of the Constitution. They point to widespread confusion. But that's a classic example of a type of injury that is not concrete and particularized. It also could not be redressed by a proclamation because there would still remain these questions about whether the ERA is, in fact, part of the Constitution. Whether there is or isn't a proclamation or certification doesn't answer those questions. And so, any sort of confusion that's out there would remain. The Supreme Court's decision in Fairchild v. Hughes, I think, is a good example, speaking to that point, where there were individuals who sued to rescind the ratification, the certification, to seek to have rescinded the certification of the 19th Amendment. And they pointed to the possibility of confusion, excuse me one second, among election officials. And the Supreme Court said, that's just the same as an injury that any person could have in asking that their government follow the law. That's not sufficient to confer standing to seek to have certification rescinded. There's no reason it would be any different in this instance. Let me ask you another question about the jurisdictional question. So, the Supreme Court has said that there is no hierarchy of threshold jurisdictional issues. And we have jurisdictional issues we can decide, like here we could decide standing or mandamus in either order. And I guess I'm wondering if that absence of a hierarchy holds true also where one of the jurisdictional grounds is mandamus. Because mandamus, you know, the jurisdictional question of the Mandamus Act merges with the merits. And so I'm wondering, I was not able to find any cases that specifically spoke to that question. So like in a context where one jurisdictional grounds merges with the merits, do we have to address standing before we reach the Mandamus Act or do you have a view about that question? I'm also not aware of any precedent that would answer that question directly. I think in this case, it makes more sense to just answer the standing question and find the standing. In part because, as you say, the mandamus question merges with the merits. The merits present all kinds of really fascinating and I'm sure tempting to decide constitutional questions. But they are important questions that should really be left for a case in which there is an actual contradiction. What if standing seems harder than the mandamus question? You're not looking at it, right? I mean, I'm happy to talk about the mandamus question, but I really think the standing question is not difficult. The states have not identified any actual injury that they suffer that would be rejected by the proclamation that they seek. Proclamation has no legal effects. The only injury they really need to is a sort of confusion. They talk about practical effects. They don't really talk about what those practical effects are. They just sort of vaguely wave at like practical consequences that might follow from a certification. But nothing legal follows from a certification. And these sort of practical consequences are kind of vague and undifferentiated. If I could just for a second address Coleman, that's the case that my friend from Illinois largely relies on. That case is not applicable here for two primary reasons. The first is that that is a case of five state legislators against a state legislative official. There was no federal defendant in that case. There were 20 state, Kansas state senators who sued the Kansas Secretary of the Senate, trying to block the official notice to the federal secretary of state that Kansas had voted to approve the child labor amendment. So that's a totally different sort of setup. It's at a different stage of the ratification process than this case. But the other reason is that that case involves 20 state senators who came together. Also, Coleman is a difficult decision to parse. It's hard to count votes for different propositions in that case. Justice Scalia hopefully explained in his defense in a legislature case. But the Supreme Court in later cases, such as that case in Reims, has said that Coleman stands at most for the proposition that legislators have standing to sue if the group of plaintiffs in this case together had enough votes to make something happen or to block something happen. Here you have only two states, not enough to make something happen in the ratification space, not enough to block something happen. And so the Coleman decision just doesn't help these plaintiffs at all. Now, you've indicated that the archivist had a ministerial duty. Okay. Ministerial duty is issuing a certification once there's been a decision made that there has been a sufficient number of votes to ratify. Okay. So ministerial meaning mandatory? It is mandatory once that determination is made. But there is an element of judgment that needs to come into play, as I think the plaintiffs can see, at least in some circumstances, in determining whether there's been a sufficient number of states that have voted to ratify. And so, for example, everyone agrees that the archivist, and before that the GSA administrator or the secretary of state, and look for the notices and make sure that they use, that the state used the mode of ratification that was specified. With respect to the 16th amendment, there were various errors made in the states, in the amendments that they voted to ratify, conceded, I think, that the archivist, so look at that and make sure that there were no substantive differences in what they submitted. Okay. But then talk to me about the timeframe. Right. And so, I think because the plaintiffs are the ones seeking mundaneness, the burden is on them to show that they have a fair right to relief. They don't identify literally any authority that would support the view that the archivist is required to ignore the timeframe that Congress put in the proposal when it proposed this amendment. And so, I think the most you could say on their side is it's an interesting open question. And that's certainly not enough to get you mundaneness. But then you're indicating that there's some judgment associated with the role. You say it's ministerial, you say it's mandatory, but then there's also judgment associated with the role. Yes. Once the judgment has been made that a sufficient number of states have voted to ratify, then issuing the certification is mandatory and ministerial. But first, the statute requires the archivist to decide whether the official notices are notices that the states have ratified in accordance with the Constitution. And so, that requires the state's assessment that I've been talking about. The plaintiffs also concede that the, as discussed in the first part of this argument, that the archivist would love to make sure that the text of the amendment that received voted to ratify is actually the text of the amendment that Congress proposed, that they didn't add things or subtract things and vote on something different. So, the archivist is allowed to make sure that the official notices, he's not allowed to, she's not allowed to look behind. You're distinguishing the text of article five versus the resolution. So, the amendment versus? Yes. Yes. So, right. But the amendment, the article five gives Congress the authority to exempt, for example, you know, to set the language of the amendment, set the mode of ratification. The Supreme Court said in Dillon that setting a timeline like this incidents to the authority to set the mode of ratification. And so, you know, the OAC opinion that was issued in 2020 suggests that archivists have the ability to look and make sure that the state complied with that limit. But does there appear to be a legal judgment that the archivist was having to go through? I mean, you all are disputing this deadline and whether it has legal effect, whether it's constitutional. And so you're suggesting that an archivist who has a ministerial duty, albeit mandatory, can go through this process for his own legal judgment? The archivist, in this case, sought legal advice from the Office of Legal Counsel, from his lawyers, essentially. And I think, you know, it is an open question whether this time limit is mandatory. But there's certainly no legal authority that suggests that the archivist was required to ignore the time limit that Congress set. And that's the kind of thing you would need for mandamus. One more. You made me forget it. Go ahead. Go ahead. Go ahead. Let's, along the questions that Judge Childs was pursuing, let's suppose the Congress had imposed a 50-year deadline. It still hasn't lapsed. Or hadn't lapsed. And there had been no purported rescission. But the archivist, for whatever reason, just decided that, even though there were 38 notices that she received, she just wasn't going to publish insertively. And these two states brought this up. Would they have standing then? No. Because they still wouldn't be injured by the failure to issue the proclamation. It made Dana's question a little easier, because there wouldn't be a judgment to be made, it would just be the ministerial part. But there still wouldn't be an injury. There might be other remedies. Congress could pass something ordering the archivist to do something, to impeach the archivist. There's lots of other things that could happen to sort of bring out that official proclamation. But these states still would not be injured by the failure to issue a proclamation in that instance. And so if an individual plaintiff, if those were the facts, and an individual plaintiff brought a lawsuit and said, you know, the Equal Rights Amendment is part of the law, it's part of the canon now, and the state is violating it by doing X, and the archivist is not certified and published, and it's not part of the statutes at large, do you think that the fact that none of those things have happened would have any impact on that plaintiff's lawsuit whatsoever? I mean, it might be an argument that a state would make in defense, but I don't think it would be a winning argument, given all of the case laws saying that the certification has no legal effect, saying that the ratification, that when the final state votes to ratify, that's when the amendment takes effect. First year, there's a two-year delay, but two years after the final state ratifies, that's when the amendment takes effect. That's clear from the case law. And so I think that would require an adjudication of whether, in fact, the ERA is part of the Constitution. Why are you saying no legal effect? Is that not cutting against your argument with respect to it being ministerial? In other words, under Des Wilkins' hypothetical of a 50-year time period, and then you say the archivist still just refuses to publish, yet there's still no legal effect. I don't understand how those two square. I'm saying that the mandamus part of that would be easier, but there would still be no standing, because the failure to publish has no legal effect. Once the final state votes to ratify, the amendment's part of the Constitution. But it seems that the archivist in this case is hesitating because of perception of legal effect if he does not publish. No, I don't think that's right. The acting archivist doesn't think that the certification would have any legal effect, but the acting archivist is trying to follow the law and ask for legal advice and got the advice that these last three votes to ratify aren't effective because they came after the expiration of the date that Congress set. And what would you cite for authority to suggest that beyond the 106 deed that there is sort of this extra implied duty, ministerial plus kind of implied duty of doing something else? The statute itself says that the archivist has to determine that the ratifications remain in accordance with the Constitution. There's also history, which means a lot in this area, where in the 16th Amendment context, I think the Secretary of State then was allowed to look at whether the changes in the deviations in what the states had voted for were meaningful. Everyone agrees that the archivist could make sure that the state used the proper modification that was established by Congress legislature or Constitutional Convention. I think everyone agrees that the archivist can look and make sure that no state added to the proposed amendment or took things away from or changed in some meaningful way the amendment. So those are all ways that the archivist makes sure that the notices are, in fact, notices that the ratification was in compliance with the Constitution. The archivist can't look behind and make sure that they comply with state procedures. That's clear from the case law also. But she can look and make sure that they comply with the Constitution. If I can add to that, I think maybe I'm wondering, you know, you said that the archivist exercises judgment. And by that, you don't mean that the archivist has discretion about whether to certify and publish. It's not a judgment about whether it's a good idea, right? Or any other kind of discretion. Like, I mean, I guess what I take you to mean when you say that the archivist exercises judgment is that the archivist, there are certain conditions precedent to making sure that the official notice complies with the Constitution. And the archivist can ensure that those conditions have been met. But that doesn't turn a ministerial duty into a discretionary one. That's right. Once it's determined that those conditions present have been satisfied, then there's a mandatory to be. I think maybe just talking about it as judgment maybe is, you know, part of what seems to be a conflict with the ministerial duty. If I can, I just want to thank the court to Dillon v. Klaus, which is an example of a case where a plaintiff had standing to seek to challenge a constitutional amendment. That was a case where you had a constitutional defendant who filed a habeas action against a federal official. He was being prosecuted for violating the National Prohibition Act. He sued a federal official who was involved in enforcing the National Prohibition Act and sought the declaration that the 18th Amendment was invalid, in part because it included a time limit. So that's when you have someone with a concrete injury who's being criminally prosecuted who sues an official who's doing something to him, who's involved in enforcing that law. We don't have either of those things here. We don't have a plaintiff to whom something is being done. And we don't have a defendant who's doing anything to anyone. And so I want to emphasize that there will be cases in the future, potentially, where these interesting questions could be teed up between adverse parties in a way that an article 3 court would have jurisdiction over. But this is not that case. And we think the simplest way to dispose of this case is on the Supreme Court. So one way to read Coleman is that the court says, oh, yeah, we said before in Dillon that Congress can, in proposing an amendment, fix a reasonable time for ratification. But the court also said that it's basically a political question to determine what a reasonable time period is. And we're not going to decide that. Right? Right-ish. I just want to caution that it actually is very hard to figure out how many votes are for what proposition in Coleman. And so there are statements of that effect in the opinion in Coleman. But I can't say with confidence that that garnered a majority of support. I will say that that was an amendment, a child labor amendment, where there was not an express time limit in the amendment. The argument was that 13 years had passed since it had been proposed and that that was too long. And many of the justices who wrote opinions in that case said, well, it's not really up to us to figure out if 13 years is too many years. But that's not the case here where you have actual deadlines set by Congress. No one's asking the court to sort of figure out on its own what would be a reasonable time. It kind of seems to me that it's somewhat question-begging, right? Because if Congress can set a reasonable amount of time, but the court, let's assume we believe that the court is incompetent or is not the appropriate body to determine what a reasonable amount of time is, if the court isn't competent to do that, then why is the archivist competent to do that? Why shouldn't the archivist just certify and publish and let Congress decide whether the timeline deadline should be enforced or whether an unreasonable amount of time is lapsed or whatever? I mean, why isn't the message we should take from Coleman that ultimately it's for the Congress to make that determination, not the court and certainly not a member of the executive? A few responses, Ronald. The first is that the court held in Dillon that seven years was a reasonable amount of time. There was an express limit of seven years in the 18th Amendment and the court said no one thinks that that's an unreasonable amount of time. Second is that the archivist isn't making a determination about whether seven years is a reasonable amount of time. The archivist is making a determination that there is a time limit that Congress set, right? And that these ratification votes that came in 2017, 2018, and 2020 happened after the time limit. And there's no law that says that the archivist has to ignore that time limit. And the third is that, I may have misunderstood your question, but it seems to contemplate a role for Congress at the back end, not just at the front end. And although Congress has, like with the 14th and 15th Amendments, issued some proclamations about when amendments were ratified, the Constitution doesn't contemplate any role for Congress at the back end. Congress proposes the amendment, goes out into the world, and the states do what they're going to do. And as you suggest, the executive branch plays no role in the actual ratification. Congress has given the executive branch the role in record-keeping, but, again, that has no legal effect. So, if somebody were to challenge the Congressional Pay Amendment today and say that it took an unreasonable amount of time for ratification and, therefore, is invalid, who would decide? Congress? Court? How do you square the court deciding that question with Coleman? If you had a plaintiff with an injury who sued an appropriate defendant, which we don't have here, then I think the court would decide that, unless the court decided it was a political question. I think that's an open and difficult question. So you don't think that Coleman would govern us in that lawsuit, assuming there was a plaintiff at stake? I mean, that would be something that a court could determine. The Supreme Court has suggested that the most you can take from Coleman is this idea that you need to have a sufficient number of legislators to make a thing happen or to block a thing from happening. I think, you know, I would leave it to a court to try to press out what other holdings you could take from Coleman. But, certainly, it would be up to a court to decide whether it was appropriate for a court to decide that question. But you would still need adverse parties presenting a concrete controversy, which we don't have here. Would it be within the realm of reason for a court to say, well, we read Coleman to say that that's really a matter for Congress, and since Congress is acquiesced in the ratification of the amendment, then that's the end of it? I think it could be. I mean, that's essentially what, you know, Assange also did in Coleman. They just said, you know, this is not something that we should. But, again, that's not what's presented here, because we have a definitive time limit that Congress put into the closing clause of the amendment. And so the question, it may be, with a proper plaintiff and proper defendant, it is certainly a question that a court may decide whether the time limit had effect, whether Congress can put in any time limits at all, although we think Dillon has already decided that question. But a court may decide whether it's appropriate to put a time limit into a closing clause. But this is not a case that presents that question because of the lack of standing, and also because of the mandamus question, because it is, at the very least, a hard and open question. There is not a clear answer to that question, and I think that prevents the court from ordering mandamus relief or allowing the disclosure. If we get past standing, I mean, don't we have to answer the question about the time limit? I don't think you have to. How do we avoid that question? Because, I mean, if the archivist's duty is ministerial, subject to certain conditions precedent, don't we have to decide whether he properly interpreted the conditions precedent? I don't think you do. There are some court cases in Con Ed v. Oshkoff and Power v. Barnhart that suggest that where you have sort of competing interpretations of a statute, as I did in our brief, then the court can decline to order mandamus relief because it's an open question whether there is, in fact, a right to the relief and a clear duty on behalf of the official. And so I think you could say in this case, well, the plaintiff has not identified a single authority that would require the archivist to ignore the deadline set by Congress. That's all you have to say. Maybe it's the opposite. Maybe it's what you said, is that there's clear case law suggesting that the time limits are valid, things for the archivist to consider. So he had a clear duty not to publish the amendment. You could say that. You know, I think our view is the court should go as small as possible in this case. That's colored by our view of the fact that there's no standing. But, you know, I think these are important questions, and it's not going to be difficult for the proper parties to tee up these questions for a court in a way where there's jurisdiction. And so we don't think this is the right case for the court to decide these questions if it doesn't need to. I don't think there's any reason to overlook the fact that the burden is on the plaintiff to show that there's a clear duty, and they literally haven't identified any authority that would suggest that the archivist is required to ignore the deadline set by Congress. That should be enough to discreetly amend the amendment. Again, we prefer the equal understanding because we think it's clear that there's no injury that would be addressable by the proclamation. I think the addressability part is particularly clear. Everyone agrees the proclamation has no legal effect. So nothing that the proclamation will do would alleviate any of the injuries, even if they counted it. There's no right to a public declaration of what the law is, where Congress has provided for a public law declaration function. You have to be injured by the lack of a declaration. It's not that there's an informational injury, because they have the information. Everybody has the information. They sent a couple of cases from this court, Barnes and Kennedy. Those are free reigns cases, and they don't think they would survive reigns. They involve legislators seeking to have laws published that they think should not have been pocket vetoed. But those cases, those legislators wouldn't have standing under a modern standing case law, a DC circuit case law. So they point out Marbury v. Madison, and you say it's distinguished. So if the Senate votes to confirm me to this court, but I never get the commission, you're saying that I would have standing. But that doesn't – I don't need the commission to – why does the commission have any legal effect? The Supreme Court said to Marbury it doesn't have any legal effect, but that the justice of the case in that case, Mr. Marbury, had a property interest in getting the commission, because it was the only evidence of his appointment. And so, you know, if whoever signs your commission refuses to give it to you, you can make that kind of an argument. I have a property interest in that commission because it is the only evidence of my appointment. Today? How would I have that argument? I mean, it would be on Twitter in five seconds. It would be a harder case to make today. So if I brought that case today and not because the president, for whatever reason, just refused to give me my commission, I wouldn't have standing, right? I think that's probably right, but the theory that was – That's sad. That's sad? I hope you have your commission. But the theory on which Marbury was decided is not the theory that the plaintiffs are using. They have not asserted any property interest in the proclamation from the acting archivist, nor could they. Maybe it's a sovereignty interest for them. I mean, the states have a co-equal role in ratifying amendments. They play their role. Well, they play their role, but so how, you know, in a subsequent case, is a court supposed to count up the 38 official notices if there's no publication by the archivist? The archivist has published this. This is the Joint Appendix Page 172. There's a copy of it. It's published a list of how the states have voted, right? And so it's not easy – it's not difficult, rather, to figure out how the states have voted. The archivist has noted when the ratification votes happened. The archivist has noted which states have purported to rescind their ratification. And so it's not as if the evidence of what the votes are is difficult to find. It's been published online by the archivist. And we could take judicial notice of that in a public case. I think you could. In a case where you have an injured scientist suing an appropriate defendant. You mentioned appropriate defendant or the proper defendant. Are you suggesting the archivist is not the appropriate defendant here? She's not an appropriate defendant because nothing that – since we're issuing a proclamation, we would not redress any injury that the states might have. You don't think they have identified injuries, but even if they have, they're absolutely not redressable by issuing a proclamation because a proclamation has no legal effect. The states are not being forced to do anything or blocked from doing anything. And the archivist is not forcing anybody to do anything or blocking anybody from doing anything. There's just no cognizable controversy between these parties. And the reason I ask that because if we were to go with you on the scanning, like a scanning, you would want to find in there that the archivist is also not the appropriate defendant, not just the plaintiff, so not the appropriate plaintiff. I think you could say that the release of plaintiff's seat would not redress any injury that they might have. That's sort of the simplest way to do it. Clarence, if the archivist were on the current fax today to publish the amendment, to certify it, would the intervening states, would they have standing? I don't think that they would have standing either. Why is that? Because they also would not be injured by the proclamation saying that the ERA is part of the Constitution because it has an illegal effect. If they were sued by some individual about that they had taken some action in contravention of the ERA, they could defend by saying, what are you talking about? The ERA is not part of the Constitution. That thing the archivist put out doesn't have any legal effect. Everyone knows that the Supreme Court has held it. And so it wouldn't cause them any injury. It wouldn't require them to do anything. They are either currently required to comply with the ERA or they aren't. Nothing that the archivist could do. So the standing question is parallel. In our view, we didn't take a position on the intervener standing in the district court. And the district court thought that they had standing to intervene, but it said it was sort of a preliminary. Thank you, Ms. Harrington. Ms. Nelson, why don't you take four minutes for rebuttal. Thank you, Your Honor. So I promised you a case site for the proposition that the summary dismissal in Freeman was non-presidential. The case I was thinking of is Wisconsin Department of Revenue versus Wrigley. It's found at page 61 of Helen's brief. So on the issue of standing, there was some discussion. There's willkins about Section 112 and Marbury. We do believe Marbury is relevant here. What Marbury held is that the deprivation of evidence that an act has occurred is a legally cognizable injury, even if that deprivation does not undermine the validity of the act. So we think it certainly supports the view that the deprivation in our view of the amendment being admissible into evidence is a legally cognizable injury. There was some discussion about whether we have just suffered a concrete injury personal to us. Our view is that yes, we have. Our ratification votes are not being given their intended effect. And while opposing counsel referred to the list of state ratifications that's published by the archivist, it lists our state as having ratified after the deadline. So it's clear that the archivist is not giving our state ratifications their intended effect. That is exactly the same injury that was suffered by the plaintiffs in Pullman. We don't think Pullman is distinguishable on the basis that there were more plaintiffs there. The fact that there were more plaintiffs in Pullman does not appear to be relevant to the Supreme Court's decision in Pullman. And it certainly wouldn't make sense for this court to hold that just because other states could have joined our lawsuit and for whatever reason did not do so, we should not be allowed to vindicate our ratification votes, which again is a legally cognizable injury. Let's see. Opposing counsel mentioned the Fairchild case. That case is distinguishable there because the plaintiff had no cognizable injury. That plaintiff was suing, seeking a declaration that the 19th Amendment was invalid on a theory that the election officials would be confused. But the plaintiff wasn't an election official. So the court said there is no cognizable injury. Here, our injury is the fact that our ratification votes are not being given their intended effect. But you said that they have been given an effect because you think that ERA is part of the Constitution. So that's not the legal effect, that's your injury. Well, I think to talk about legal effect and equate that with constitutional validity, that's a too narrow view of what injury is. Our position is that there are practical consequences associated with publication and ratification. They include making the amendment admissible into evidence in court. They include the fact that people are going to be more likely to take advantage of the amendment we have sought to secure for them. And they include the fact that other states and perhaps the federal government who have not brought their laws into compliance with the amendment might become more willing to do so. That is a cognizable injury and it is regressible by a court order directing the archivist to publish and certify. Basically, on the archivist's theory, the plaintiff states who are separate sovereigns who exercise their constitutionally delegated role in the amendment process are supposed to watch and wait for some unnamed other plaintiff to sue, perhaps in a remote jurisdiction, under circumstances where we believe that an unelected executive branch official is failing to properly count our ratification votes. There's simply nothing in standing principles that requires that. So, and I'll just very quickly, because I see I have 37 seconds, on the mandamus issue. We talked about this in the opening, but there's nothing in this court's cases that suggests that the presence of an interpretive question, even a question of first impression, and I do understand the archivist's counsel to agree that whether the deadline is enforceable is an open and perhaps a closed question. But there's nothing to suggest that the presence of that question precludes mandamus when the government official's duty is mandatory. Section 106B creates a mandatory duty. It uses the terms shall and whenever, and it was interpreted by this court in Coleman to be purely ministerial. Under the archivist's theory, mandamus would essentially never be available, because a government official, even when that official has a ministerial duty by statute, could always claim that performing that duty requires statutory interpretation. That is simply not the law of this court, and I would point the court to the 13th Regional Corporation case, which is cited in both parties' briefs. And in that case, what happened is the court found that a government official had a mandatory duty subject to mandamus, even after resolving a closed question of statutory interpretation that was hotly disputed by the party. So, as Ms. Harrington pointed out, it is your duty to show that there is a clear duty under the conditions. And we believe we have shown that by virtue of Section 106B. It has already been interpreted by this court to create a purely ministerial duty, and the fact that some other question of interpretation might be involved doesn't preclude mandamus when the controlling statute creates a mandatory duty. So, thank you very much for your time, and we request that you reverse and remand to the district court for resolution of the outstanding issues. Thank you. We will take the case under advisory.
judges: Wilkins, Rao, Childs